Argued and submitted September 13, 2013, affirmed January 2, 2014

In the Matter of C. G., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. G.,
fka J. G.,
*Appellant.*

Klamath County Circuit Court
0400574JV4;
Petition Number 0900378M;
A153864

317 P3d 936

Megan L. Jacquot argued the cause and filed the brief for appellant.

Greg Rios, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

### NAKAMOTO, J.

This juvenile dependency case involves a mother and child who are enrolled members of the Klamath Tribe. Under the Indian Child Welfare Act (ICWA), 25 USC §§ 1901 - 1963, involuntary child custody proceedings involving Indian children must comply with certain federal requirements. Among those is a requirement that any party seeking to effect a foster care placement of an Indian child shall satisfy the court that active efforts have been made to provide services to prevent the breakup of the Indian family, and that such efforts have failed. 25 USC § 1912(d). Relying on that section of ICWA, mother appeals a judgment establishing a durable guardianship for her son under ORS 419B.366,[1] arguing that the juvenile court's failure to make an "active efforts" finding in the guardianship judgment is reversible error.[2] Mother failed to preserve that issue below, but nonetheless argues that section 1914 of ICWA allows her to raise it for the first time on appeal. For the reasons that follow, we agree with mother that her argument is reviewable despite not being preserved, but nonetheless conclude that the juvenile court was not required under ICWA to make an "active efforts" finding in the guardianship judgment. Accordingly, we affirm.

### I. STANDARD OF REVIEW

Before turning to the facts of this case, we must establish the appropriate standard of review. Mother requests that we review this case *de novo*. In juvenile proceedings that do not involve the termination of parental rights, exercise of *de novo* review is within our sole discretion. ORS 19.415(3). Nonetheless, there is a presumption against granting *de novo* review, and we do so only in exceptional cases. *Dept. of Human Services v. N. S.*, 246 Or App

---

[1] The term "durable guardianship" is not used in ORS 419B.366, but we use that term to distinguish a guardianship established under that statute from a permanent guardianship established under ORS 419B.365, and a guardianship as an incident of custody established under ORS 419B.370. *Dept. of Human Services v. K. H.*, 256 Or App 242, 244 n 1, 301 P3d 427, *modified on recons*, 258 Or App 532, 310 P3d 671 (2013).

[2] In her brief, mother asserts five assignments of error; we write solely to address her first assignment of error and reject the remaining four assignments without discussion.

341, 344, 265 P3d 792 (2011), *rev den,* 351 Or 586 (2012); ORAP 5.40(8)(c).

Mother argues that this is an exceptional case for three reasons. First, mother asserts that the guardianship is like a termination of her parental rights because, she contends, she cannot seek to have it modified due to ORS 419B.368(7). We disagree. That subsection provides that "a parent may not move the court to vacate a guardianship once a guardianship is granted under ORS 419B.365." The guardianship in this case, however, was established under ORS 419B.366, and, accordingly, can be vacated upon a motion from a parent. *See* ORS 419B.368(1) ("The court, on its own motion or upon the motion of a party *** may *** modify or vacate a guardianship order.").

Second, mother argues that this case is exceptional because it involves an Indian child and thus implicates a different evidentiary standard than a review involving a non-Indian child. However, we have already rejected the argument that a case implicating ICWA mandates *de novo* review. *See DHS v. Three Affiliated Tribes of Fort Berthold,* 236 Or App 535, 541 n 6, 238 P3d 40 (2010) (noting that the importance of the policies involved in a case does not dictate the standard of review). Furthermore, the dispositive issue in this appeal is legal, not factual.

Finally, mother contends that this case requires *de novo* review because the juvenile court failed to make certain factual findings. We have only exercised our discretion to grant *de novo* review in two juvenile dependency cases— each of which involved a situation where crucial findings made by the court were inconsistent with uncontroverted evidence in the record. *Dept. of Human Services v. M. E. (A150359),* 255 Or App 296, 299, 297 P3d 17 (2013); *Dept. of Human Services v. B. B.,* 248 Or App 715, 718, 274 P3d 242, *adh'd to on recons,* 250 Or App 566, 281 P3d 653 (2012). Here, mother does not contend that the juvenile court's findings were inconsistent with the evidence, but rather that the juvenile court failed to make a required finding altogether. We conclude that *de novo* review is not warranted in such a situation. Thus, for the reasons stated, we reject mother's invitation to review this case *de novo.*

Accordingly, we review the juvenile court's legal conclusions for errors of law and are bound by its findings of historical fact if there is any evidence in the record to support them. *N. S.*, 246 Or App at 344. As stated above, the dispositive issues are legal, and the facts are largely undisputed.

## II.  STATEMENT OF FACTS

Both mother and child are enrolled members of the Klamath Tribe. The Department of Human Services (DHS) was granted jurisdiction over child in 2009, and he has been in his current foster home since January 2010.[3] Initially, child's permanency plan was return to mother; however, after a permanency hearing in February 2011, the juvenile court issued an order and judgment approving a permanency plan for establishment of a legal guardianship for child. In that order and judgment, the juvenile court found by clear and convincing evidence that DHS had "made active efforts to make it possible for [child] to safely return home," but that "mother [had] not made sufficient progress to make it possible for [child] to safely return home."[4] A year later, in a May 2012 permanency hearing, the juvenile court continued the plan of guardianship for child.

In 2013, DHS filed a motion to establish a guardianship for child with his current foster parent under ORS 419B.366.[5] That statute provides, in part:

"(1)  A party * * * may file a motion to establish a guardianship. The motion must be in writing and state with particularity the factual and legal grounds for the motion.

"* * * * *

"(3)  If an Indian child is involved, the guardianship must be in compliance with the Indian Child Welfare Act. The facts supporting any finding made to establish a guardianship for an Indian child, including the finding

---

[3] Child's sibling was also placed in substitute care; however, mother's appeal relates only to the order and judgment establishing a guardianship for child.

[4] The judgment and order outlined what services were offered to mother, and why mother's progress was not sufficient.

[5] DHS's 2013 motion to establish a guardianship was an amended version of a motion it filed in July 2012.

that continued custody by the parents or Indian custodian would result in serious emotional or physical harm to the Indian child, must be established by clear and convincing evidence.

"* * * * *

"(5)   If the court has approved a plan of guardianship under ORS 419B.476, the court may grant the motion for guardianship if the court determines, after a hearing, that:

"(a)   The ward cannot safely return to a parent within a reasonable time;

"(b)   Adoption is not an appropriate plan for the ward;

"(c)   The proposed guardian is suitable to meet the needs of the ward and is willing to accept the duties and authority of a guardian; and

"(d)   Guardianship is in the ward's best interests. In determining whether guardianship is in the ward's best interests, the court shall consider the ward's wishes.

"(6)   Unless vacated pursuant to ORS 419B.368, a guardianship established under this section continues as long as the ward is subject to the court's jurisdiction as provided in ORS 419B.328."

After a hearing, the juvenile court granted DHS's motion and entered an order and judgment appointing child's current foster parent as his legal guardian. In that order and judgment, the juvenile court found "by clear and convincing evidence" that:

"6.   The ward is an Indian child within the meaning of the Indian Child Welfare Act * * *.

"* * * * *

"8.   The Court approved a plan of guardianship for the ward at the permanency hearing held on May [24], 2012, pursuant to ORS 419B.476.[6]

"9.   The ward cannot safely return to a parent within a reasonable time.

---

[6] The juvenile court first approved the plan of guardianship for child in the February 2011 permanency hearing. At the May 2012 permanency hearing referenced in the juvenile court's order, the court continued the plan of guardianship for child.

"10. The continued custody of the ward by his parents will result in serious emotional harm to the ward.

"11. Adoption is not an appropriate plan for the ward.

"12. The ward should no longer be in the legal custody of DHS but should continue to be a ward of this Court.

"13. The proposed guardian is suitable to meet the needs of the child and is willing to accept the duties and authority of a guardian. Placement of the ward with the proposed guardian meets the placement preferences of the Indian Child Welfare Act.

"14. Guardianship is in the ward's best interest."

Mother now appeals that judgment.

## III. ANALYSIS

### A. *Preservation*

On appeal, mother argues that the juvenile court erred in failing to make a finding that DHS had made active efforts to prevent the breakup of the Indian family, which she contends is required by section 1912(d) of ICWA. However, DHS urges us to affirm the juvenile court because mother failed to raise that issue below. Thus, we first consider whether mother's assignment of error is properly before us.

Generally, for an error to be reviewable, the party asserting the error must have preserved the claim of error in the lower court. ORAP 5.45(1); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991). However, even if a party has failed to preserve an issue, the appellate court "may consider an error of law apparent on the record." ORAP 5.45(1). At oral argument, mother conceded that her "active efforts" argument was not raised below, and she does not argue, nor would we agree, that any error is plain and apparent on the record. She nonetheless argues that under 25 USC section 1914, ICWA violations can be raised for the first time on appeal. That section provides:

"Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action

upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title."

Mother contends that she can invoke section 1914 and that, because we have jurisdiction to hear this appeal, we are a "court of competent jurisdiction" and therefore can review her "active efforts" argument despite Oregon's preservation rule. DHS responds that section 1914 does not apply to this case because the guardianship was not an action for "foster care placement or termination of parental rights."[7] Because we conclude, as mother argues, that the guardianship was an action for "foster care placement" under ICWA, which we later explain, the issue becomes whether section 1914 preempts Oregon's preservation rule. Because neither party made express arguments about preemption, we requested supplemental briefing on the subject.

In her supplemental memorandum, mother argues that express, field, and conflict preemption all apply in this case to preempt Oregon's preservation rule. In its supplemental memorandum, DHS argues that neither express nor field preemption applies in this case, and that Oregon's preservation rule is not preempted by ICWA under conflict preemption. For the reasons that follow, we agree with DHS that neither express nor field preemption applies in this case, but disagree with DHS's argument that Oregon's preservation rule is not preempted by ICWA under principles of conflict preemption.

Whether section 1914 preempts Oregon's preservation rule is a matter of first impression in Oregon and raises a question of law. *State ex rel Juv. Dept. v. Shuey*, 119 Or App 185, 187, 850 P2d 378 (1993) (whether federal law preempts state law is a question of law). The power of Congress to preempt state law is rooted in the Supremacy Clause of Article VI of the United States Constitution.[8] The Supreme Court

---

[7] DHS does not otherwise contend that mother is not a parent "from whose custody such child was removed" under section 1914. *See* 25 USC § 1916(b) and our later discussion of that section, 260 Or App at 519-20.

[8] Article VI provides, in relevant part:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

of the United States has identified three categories of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. *Willis v. Winters*, 350 Or 299, 308, 253 P3d 1058 (2011), *cert den*, ___ US ___, 132 S Ct 999, ___ US ___, 132 S Ct 1001 (2012).

As an initial matter, we agree with DHS that, in this case, neither express nor field preemption are implicated. Congress did not expressly state that ICWA preempts state rules of appellate procedure, nor does the statutory scheme of ICWA imply that Congress intended ICWA to be the only source of regulation in the field of child custody proceedings involving Indian children. *See* 25 USC § 1902 (explaining that ICWA represents national policy of promoting "the stability and security of Indian tribes and families by the establishment of *minimum Federal standards* for the removal of Indian children from their families" (emphasis added)). Accordingly, for Oregon's preservation rule to be preempted by ICWA, there must be a conflict between the two.

Conflict preemption occurs when a Congressional intent to preempt state law can be implied from an actual conflict between the state and federal law. *Winters*, 350 Or at 308. This "actual conflict" can arise in two ways: (1) when it is physically impossible for a party to comply with both the state and federal law; or (2) when the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 308 (quoting *Hines v. Davidowitz*, 312 US 52, 67, 61 S Ct 399, 85 L Ed 581 (1941)). We agree with DHS that the first situation—so-called "impossibility" preemption—is not implicated here because mother could have complied with both the federal and state laws if she had preserved her claim of error in the juvenile court. *See, e.g., Pliva, Inc. v. Mensing*, ___ US ___, 131 S Ct 2567, 2577, 180 L Ed 2d 580 (2011) (explaining that state law is preempted by impossibility when "[i]t was not lawful under federal law for the [party] to do what state law required of [him or her]"). However, we disagree with DHS that the second type of conflict preemption, so-called "obstacle" preemption, is not applicable here, and for the reasons that follow, we conclude that Oregon's preservation rule is preempted by ICWA in this case.

We resolve issues of "obstacle" preemption by determining the purposes and intended effects of the federal law and comparing them to the effects of the state law to determine whether that state law "obstructs the accomplishment of the objectives [of the federal statute] that have been identified." *Winters*, 350 Or at 309. The United States Supreme Court has explained that

> "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects:
>
> "'For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.'"

*Crosby v. National Foreign Trade Council*, 530 US 363, 373, 120 S Ct 2288, 147 L Ed 2d 352 (2000) (internal citations omitted).[9]

We begin, then, with an examination of ICWA to determine its purpose and intended effects. Congress enacted ICWA in 1978 to address the

> "rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes."

*Mississippi Choctaw Indian Band v. Holyfield*, 490 US 30, 32, 109 S Ct 1597, 104 L Ed 2d 29 (1989). In its report, the House Committee on Interior and Insular Affairs explained

---

[9] We note that the Supreme Court has recognized that a lower standard for preemption can apply in cases involving tribal interests, but that that lower standard need not be applied where the state law is preempted under normal preemption standards. *New Mexico v. Mescalero Apache Tribe*, 462 US 324, 333-34, 103 S Ct 2378, 76 L Ed 2d 611 (1983). We conclude that this is such a case.

that "[i]t is clear * * * that the Indian child welfare crisis is of massive proportions and that Indian families face vastly greater risks of involuntary separation than are typical of our society as a whole." HR Rep No 1386, 95th Cong, 2d Sess, *reprinted in* 1978 USCCAN 7530, 7532 (hereinafter HR Rep No 1386). The Committee further stated that

> "[t]he decision to take Indian children from their natural homes is, in most cases, carried out without due process of law. For example, it is rare for either Indian children or their parents to be represented by counsel * * * or have the supporting testimony of expert witnesses.
>
> "Many cases do not go through an adjudicatory process at all, since the voluntary waiver of parental rights is a device widely employed by social workers to gain custody of children."

*Id.* at 7533.

In its findings, Congress explained that the "United States has a direct interest, as trustee, in protecting Indian children" and that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 25 USC § 1901(3), (4). In response to those findings, Congress enacted ICWA, establishing that "it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 USC § 1902. In *Holyfield*, one of only two United States Supreme Court decisions discussing ICWA, the Supreme Court explained:

> "It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities.[17] * * * Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct. [*See*] 25 [USC] § 1901(5) (state 'judicial bodies [* * *] have often failed to recognize the essential tribal relations of Indian people and the

cultural and social standards prevailing in Indian communities and families').

---

"[17] This conclusion is inescapable from a reading of the entire statute, the main effect of which is to curtail state authority. [*See especially*] §§ 1901, 1911-1916, 1918."

490 US at 44-45, 45 n 17.

Of the ICWA provisions created to protect against abusive state practices, section 1914 is perhaps the most powerful. The plain language of that section confers on eligible parents the right to enforce ICWA by authorizing them to challenge foster care placements or termination of parental rights actions for violations of sections 1911, 1912, and 1913 in "any court of competent jurisdiction." When viewed against the backdrop of the congressional findings supporting ICWA, as well as Congress's stated policy to "promote the stability and security of Indian tribes and families," the purpose of section 1914 is to provide an enforcement mechanism to the parties who are most affected by the abusive state welfare practices that Congress sought to remedy by enacting ICWA. The intended effect of that section, therefore, is to allow those parties to challenge, in "any court of competent jurisdiction," including an appellate court, any action for foster care placement or termination of parental rights that violates certain sections of ICWA.[10] Thus, the intended purpose and effect of ICWA was to create federal standards to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 USC § 1902. One method by which Congress chose to do this was through the enforcement provision in section 1914.

Having considered the purpose and intended effects of ICWA, we now turn to the effect of Oregon's preservation rule. That rule provides, as relevant here, that "[n]o

---

[10] That interpretation of the purpose and intended effect of section 1914 is confirmed by the legislative history:

"Section [1914] authorizes the child, parent, or Indian custodian, or the tribe to move to set aside any foster care placement or termination of parental rights on the grounds that the rights secured under sections [1911, 1912,] or [1913] were violated."

HR Rep No 1386 at 7546.

matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * *, provided that the appellate court may consider an error of law apparent on the record." ORAP 5.45(1). The effect of that rule is that, absent the preservation of a claim of error in the proceeding below, this court will not consider an assignment of error unless it is "apparent on the record." Here, mother does not claim, nor would we agree, that the juvenile court's failure to make an "active efforts" finding was an error of law apparent on the record. Therefore, the effect of the preservation rule under the circumstances of this case is that it would preclude us from reviewing mother's "active efforts" argument.

In light of the purpose and intended effects of ICWA and the effect of Oregon's preservation rule, we must decide whether the preservation rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" embodied in ICWA. DHS argues that obstacle preemption does not apply here because the policies behind Oregon's preservation rule are entirely consistent with the policies of ICWA. According to DHS, ICWA's stated policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families," 25 USC § 1902, is compatible with the policy behind Oregon's preservation rule—which is to ensure judicial efficiency and promote fairness to the adversary parties. DHS finds it significant that the preservation rule is meant to ensure fairness and efficient proceedings for all parties, which it views as an objective that furthers ICWA's policy in section 1902 of "protect[ing] the best interests of Indian children" and "promot[ing] the stability and security" of Indian tribes in juvenile court proceedings. We disagree.

DHS reads the purpose and intended effects of ICWA in a generalized fashion, ignoring the role that section 1914 plays in the statutory scheme of ICWA. Under that section, Congress empowered particular parties with a right to challenge certain Indian child custody proceedings on the basis of ICWA violations. Given that the broad purpose of

ICWA is to protect the best interests of Indian children "by the establishment of minimum Federal standards for the removal of Indian children from their families" and section 1914 provides a method of enforcing those minimum federal standards, a state rule that precludes a party from using section 1914 on appeal to assert a right under section 1912(d) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Additionally, we reject DHS's argument that Oregon's preservation rule is not preempted by ICWA because both the rule and ICWA are aimed at increasing fairness in juvenile court proceedings. The Supreme Court has explained that

> "[i]n determining whether state law stands as an obstacle to the full implementation of a federal law, it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal."

*Gade v. National Solid Wastes Management Assn.*, 505 US 88, 103, 112 S Ct 2374, 120 L Ed 2d 73 (1992) (internal quotation marks omitted; second brackets in *Gade*) (rejecting the petitioner's argument that the federal law at issue did not preempt nonconflicting state laws because those laws, like the federal law, were designed to promote worker safety). Thus, the fact that it could be said that both Oregon's preservation rule and ICWA have goals of fairness does not, in itself, mean that the preservation rule is not preempted. Where, as is the case here, the state law interferes with a method created to achieve the goal of the federal law, the state law is preempted. In this case, section 1914 is one of the methods Congress created to achieve the goals of ICWA, and the preservation rule would prevent mother from invoking that method on appeal. Therefore, although Oregon's preservation rule does not necessarily foreclose a parent from challenging a child custody proceeding for violating ICWA, it does require the parent to preserve the argument to do so. In effect, then, the preservation rule can, and in this case would, interfere with a party's right to invoke section 1914 as a means of enforcing ICWA—one of the methods Congress

designed to achieve the goal of "promot[ing] the stability and security of Indian tribes and families." The Supreme Court has explained that "where state courts entertain a federally created cause of action, the federal right cannot be defeated by the forms of local practice," and "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 US 131, 138, 108 S Ct 2302, 101 L Ed 2d 123 (1988) (internal quotation marks omitted).

Therefore, because under these circumstances Oregon's preservation rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Winters*, 350 Or at 308 (internal quotation marks omitted), it is preempted by section 1914, and accordingly must yield.[11]

---

[11] In a survey of cases from other states that have considered this issue, the majority have concluded that an ICWA violation may be raised for the first time on appeal, even when a state rule ordinarily requires preservation. *See In re S. M. H.*, 33 Kan App 2d 424, 430, 103 P3d 976, 981 (2005) (concluding that section 1914 "provides that 'any parent [* * *] may petition any court of competent jurisdiction to invalidate [an action for foster care placement] upon a showing that such action violated any provision of'" sections 1911, 1912, or 1913 of ICWA (second brackets in original)); *People ex rel. S. R. M.*, 153 P3d 438, 441 (Colo Ct App 2006) (concluding that "[t]he tribe may raise the issue of inadequate notice in the first instance in this court, as the ICWA specifically provides that the issue of inadequate notice may be raised in 'any court of competent jurisdiction'"); *State ex rel. Children Youth and Families Dept. v. Arthur C.*, 149 NM 472, 482, 251 P3d 729, 739 (NM Ct App 2011) (explaining that, despite the father's failure to preserve his "active efforts" argument, that failure "does not prevent us from reviewing the record to determine if the district court fulfilled its obligation to abide by the requirements of ICWA" (internal quotation marks omitted)); *In re J. J. C.*, 302 SW 3d 896, 899 (Tex Ct App 2009) (applying a conflict preemption analysis and holding that "the provisions of the ICWA allowing post-judgment challenges to involuntary termination proceedings preempt the Texas rules and statutes regarding preservation of error," and that "the protections enumerated in the ICWA are mandatory as to the trial court and the Department, * * * they preempt state law, and the failure to follow the ICWA may be raised for the first time on appeal"); *G. L. v. Department of Children and Families*, 80 So 3d 1065, 1067 (Fla Dist Ct App 2012) (same); *Matter of L. A. M.*, 727 P2d 1057, 1059 (Alaska 1986) (considering the mother's ICWA notice argument though she did not raise it below, stating that error was plain and that "ICWA specifically authorizes a parent to 'petition any court of competent jurisdiction to invalidate [a termination of parental rights] upon a showing that such action violated' certain ICWA provisions, including the act's notice requirements" (quoting 25 USC § 1914)). *But see In Interest of J. D. B.*, 584 NW 2d 577, 581 (Iowa Ct App 1998) (concluding that "[t]o have our procedural rules preempted by federal law, would serve no greater purpose under ICWA," that preservation rules contribute "to an orderly and timely disposition of controversies," and that the rules "do not conflict with any provision of ICWA or frustrate congressional policy").

Because we conclude that mother's failure to preserve her "active efforts" argument in the juvenile court does not preclude our review, we now turn to the merits of that argument.

B. *Mother's "active efforts" argument*

Mother argues that section 1912(d) of ICWA required the juvenile court to make a finding that DHS had made "active efforts" to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that such efforts had failed. Section 1912(d) provides:

> "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

Mother contends that, because the "active efforts" standard is required any time a party seeks to effectuate a foster care placement, and because a guardianship is a "foster care placement," the juvenile court was required to make an "active efforts" finding when it established the guardianship.

In response, DHS argues that the guardianship was not a "foster care placement" under ICWA. Relying on our decision in *Dept. of Human Services v. W. H. F.*, 254 Or App 298, 295 P3d 78 (2012), *rev den*, 353 Or 428 (2013), DHS asserts that we have already decided that ICWA's "active efforts" requirement does not apply to non-termination proceedings in which the case plan is no longer return to parent. For the reasons that follow, we agree with mother that the guardianship was a "foster care placement" under ICWA, but we disagree that the juvenile court was required to make an "active efforts" finding in the proceeding establishing the guardianship.

Section 1912(d) requires "evidence of active efforts to provide specific services and programs for a parent * * * only when a party is seeking to effect a 'foster care placement' or termination of parental rights." *W. H. F.*, 254 Or App at 303. Because neither party contends that DHS was

seeking to effect a termination of mother's parental rights in the guardianship proceeding, the resolution of this appeal requires us to consider two interrelated questions: (1) whether the durable guardianship established in this case was a "foster care placement" under ICWA; and (2) if it was, whether ICWA required the juvenile court to make an "active efforts" finding at the proceeding in which the guardianship was established.

### 1. *"Foster care placement" definition under ICWA*

ICWA defines the term "foster care placement" as

> "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated."

25 USC § 1903(1)(i). Mother argues that because ICWA's definition of "foster care placement" includes placements in "the home of a guardian," a guardianship is a "foster care placement" under ICWA. At oral argument DHS conceded that, theoretically, a guardianship could be a foster care placement under ICWA's definition, but it maintained that a durable guardianship is not a "foster care placement" because it is not "temporary." We, however, do not find that argument to be persuasive.

ICWA applies to child custody proceedings that involve an Indian child. Congress defined "child custody proceeding" to include four types of actions—two of which are implicated only after parental rights have been terminated. *See* 25 USC § 1903(1)(iii) - (iv) (defining "preadoptive placement" as "the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement," and "adoptive placement" as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption"). The remaining two types of actions covered by ICWA are foster care placements and terminations of parental rights. 25 USC § 1903(1)(i) - (ii). ICWA defines a "termination of parental rights" as "any action resulting in the termination of the parent-child

relationship." *Id.* at § 1903(1)(ii). When viewed side by side, the definitions of foster care placement and termination of parental rights reveal that the term "temporary placement" merely distinguishes a foster care placement from an action that would permanently end the parent-child relationship. Therefore, a durable guardianship established under ORS 419B.366 is temporary in the sense that it does not terminate parental rights, and it may be vacated by a court. *See* ORS 419B.368(1) ("The court *** may review, modify or vacate a guardianship order.").[12]

Thus, one obvious problem with DHS's argument is that it removes an entire class of dependency placements from the protection of ICWA. Under its interpretation of "foster care placement," a durable guardianship—which places an Indian child in the legal and physical custody of a non-parent, but does not terminate the parent's rights—would not fit any of the other definitions of child custody proceedings protected by ICWA, and therefore would not be protected by its procedural or substantive standards. As a result, DHS could, with durable guardianships, avoid complying with ICWA in child custody cases involving Indian children. In light of the policies behind the enactment of ICWA, we are not satisfied that Congress intended such a result. After ICWA was enacted, the Bureau of Indian Affairs (BIA) promulgated guidelines in which it addressed what proceedings are covered by ICWA, explaining that the "entire legislative history makes it clear that [ICWA] is directed primarily at attempts to place *someone other than the parent *** in charge of raising an Indian child*—whether on a permanent or temporary basis." 44 Fed Reg 67584, 67587 (1979) (emphasis added).[13] The BIA's interpretation of ICWA's purpose in regard to what types of proceedings

---

[12] We note that at least one other court has drawn a similar conclusion. *See In re Adoption of K. L. R. F.*, 356 Pa Super 555, 562-64, 515 A2d 33, 36-38 (1986), *appeal dismissed as moot*, 516 Pa 520, 533 A2d 708 (1987) (in considering whether the consensual placement of an Indian child with prospective adoptive parents was a "foster care placement" under ICWA, the court concluded that it was, explaining that the placement was not "permanent simply because adoption may have been, at one time, the 'ultimate objective' of the parties").

[13] The BIA guidelines, while not binding legal authority, may be instructive. *State ex rel SOSCF v. Lucas*, 177 Or App 318, 324 n 4, 33 P3d 1001 (2001), *rev den*, 333 Or 567 (2002).

are covered is also confirmed by the text and context of ICWA.[14] In addition, the Oregon durable guardianship statute plainly requires compliance with ICWA when the guardianship involves an Indian child, clearly indicating the legislature's acknowledgment that such a proceeding is covered by ICWA. *See* ORS 419B.366(3). We therefore reject DHS's argument that a durable guardianship established under ORS 419B.366 is not a foster care placement because it is not "temporary."

DHS also relies on our decision in *W. H. F.* to support its argument that the guardianship here is not a foster care placement under ICWA. In that case, a father appealed a judgment continuing a permanency plan of adoption for his child, arguing that ICWA required the court to make an "active efforts" finding at that procedural stage. We rejected that argument, and, applying section 1912(d) and ICWA's definition of foster care placement, we concluded that "[a] continuation of a permanency plan for adoption is not the act of effecting a 'foster care placement' as defined" and "a showing of active efforts is not required by ICWA in that context." 254 Or App at 304.

To the extent that DHS reads our holding in that case to mean that the creation of a guardianship is not a foster care placement, we reject that reading of *W. H. F.* The issue in that case was whether, in the context of a *continuation of a permanency plan for adoption*, DHS was "seeking to effect" a foster care placement under ICWA, such that an "active efforts" finding was required at that procedural stage. Our resolution of that issue did not decide whether a durable guardianship was a foster care placement, or whether a party is "seeking to effect a foster care placement" at a hearing to establish a guardianship under ORS

---

[14] For example, ICWA expressly excludes from the definition of "child custody proceeding," placements resulting from juvenile delinquency proceedings (the definition of child custody proceeding "shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime"), as well as placements of an Indian child with one parent as a result of divorce proceedings. 25 USC § 1903(1). Those exclusions demonstrate that the protections in ICWA for "foster care placements" were intended to apply to proceedings, like the one present here, that involve the placement of Indian children with someone other than a parent whose rights have not been terminated, but the parent cannot have the child returned upon demand.

419B.366. Moreover, unlike the proceeding in *W. H. F.*, the proceeding in this case went beyond the *status quo* continuation of a permanency plan. Therefore, we turn to ICWA's definition of a foster care placement to determine whether the guardianship in this case qualifies.

ICWA's definition of a "foster care placement" contains four elements: an action (1) removing an Indian child from its parent or Indian guardian; (2) for temporary placement in a foster home or institution, or in the home of a guardian or conservator; where (3) the parent or Indian custodian cannot have the child returned upon demand; but where (4) parental rights have not been terminated. 25 USC § 1903(1)(i). The guardianship in this case met all four of those elements.

Although child was initially removed from his mother's physical and legal custody in 2009, we agree with mother that ICWA's definition of "foster care placement" should not be read narrowly to include only the initial removal of the child from his or her parents.[15] Mother argues, and we agree, that 25 USC section 1916(b) demonstrates that ICWA's provisions are intended to apply not just to the initial removal and placement of an Indian child, but also to subsequent placements. Section 1916(b) of ICWA directs that

> "[w]henever an Indian child is removed from a foster care home or institution for the purpose of further foster care, preadoptive, or adoptive placement, such placement shall be in accordance with the provisions of this chapter, except in the case where an Indian child is being returned to the parent ***."

---

[15] We agree with the BIA guidelines that ICWA's provisions should be liberally construed:

"Congress through [ICWA] has expressed its clear preference for keeping Indian children with their families ***. Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences. [ICWA], the federal regulations implementing the Act, the recommended guidelines and any state statutes, regulations or rules promulgated to implement [ICWA] shall be liberally construed in favor of a result that is consistent with these preferences. Any ambiguities in any of such statutes, regulations, rules or guidelines shall be resolved in favor of the result that is most consistent with these preferences."

44 Fed Reg at 67585-86.

Therefore, under that section, if an Indian child is being re-placed with someone other than his or her parent or Indian guardian, that subsequent placement must comply with ICWA.[16] That scheme is consistent with both Congress's finding that "an alarmingly high percentage of Indian families are broken up by the removal, *often unwarranted*, of their children from them," 25 USC § 1901(4) (emphasis added), and Congress's express policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families," *id.* at § 1902. It also militates against a narrow reading of "foster care placement" that would only include the first removal of the child from his or her parents.

Given that understanding, we conclude that the removal element was satisfied in this case. Although child had been previously removed from mother and placed in foster care, DHS sought to legally remove child from that placement for the purpose of establishing the guardianship. The guardianship terminated DHS's custody of child and placed both legal and physical custody of child with the guardian. Although child's guardian was his current foster parent, the guardianship was a significant shift in legal rights that legally removed him from the foster care placement he was in for further placement as a ward in a guardianship. We also conclude that the remaining elements of the foster care placement definition were met: child was temporarily placed in the home of a guardian; although mother can move to vacate the guardianship, she cannot have child returned upon demand; and mother's parental rights have not been terminated. Therefore, we conclude that the guardianship in this case was a "foster care placement" under ICWA.

### 2. *"Active efforts" requirement*

Given our conclusion that the guardianship was a "foster care placement" under ICWA, we now consider whether the juvenile court was required under ICWA to make an "active efforts" finding at the proceeding in which

---

[16] The BIA guidelines confirm that, and explain that under section 1916(b), when there is a change in placement, "such placement is to be in accordance with the provisions of the Act—which requires notice to the biological parents." 44 Fed Reg at 67595.

that guardianship was established. Mother argues that, because the guardianship is a foster care placement, the juvenile court was required to include an active efforts finding in the guardianship judgment. Although we disagree with DHS's argument that the guardianship was not a "foster care placement," we conclude nonetheless that DHS satisfied ICWA's "active efforts" requirement at the 2011 permanency hearing. Therefore, the juvenile court was not required to make an "active efforts" finding in the guardianship judgment.

Section 1912(d) provides that any party seeking to effect a foster care placement of an Indian child "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" and that such efforts were unsuccessful. That section does not outline at which stage or stages in the proceedings such a finding must be made—it merely requires that the court be satisfied that active efforts were made and failed. ICWA does, however, specify, in section 1912(e), what particular findings a court must make when it actually orders a foster care placement, stating that

> "[n]o foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

Notably, Congress did not incorporate the "active efforts" requirement into this section. Thus, even though the party seeking the placement has a duty under ICWA to satisfy the court that active efforts have been made and were unsuccessful under section 1912(d), the plain language of section 1912(e) does not require that the court renew such a finding when it orders the placement. Therefore, to the extent that the party seeking the placement has satisfied the court at a prior hearing on the placement at issue that active efforts were made and failed, that party discharges its duty under section 1912(d), and the court is not required to make that finding again at a later proceeding in which it actually orders that placement.

That understanding of section 1912(d) is consistent with its legislative history. In its report, the House Committee on Interior and Insular Affairs explained the purpose behind section 1912(d), stating that

> "[t]he committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures *prior to initiating placement* * * * *proceedings*, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families."

HR Rep No 1386 at 7545 (emphasis added). That excerpt indicates that the "active efforts" requirement in section 1912(d) was meant to be remedial, that is, intended to prevent the need for placing the child outside the home. The excerpt does not reflect that Congress intended to require a child welfare agency to renew remedial efforts, after the agency has already satisfied the court of its active efforts and the court has already approved the placement, before the agency and the court can effect the placement.[17]

Oregon's dependency and durable guardianship statutes are also consistent with those requirements. Establishing a durable guardianship under ORS 419B.366 is a two-step process. In order for the court to grant a motion for guardianship, it must have previously approved a plan of guardianship at a permanency hearing under ORS 419B.476. ORS 419B.366(5). The permanency hearing statute provides, in relevant part:

---

[17] In *State ex rel Juv. Dept. v. Charles*, 70 Or App 10, 688 P2d 1354 (1984), *rev dismissed as improvidently allowed*, 299 Or 341 (1985), we considered when the showing in section 1912(d) was required in the context of the initial removal of a child. The mother in that case argued that the active efforts showing must be made before physical removal of the child, and we explained that

> "the statute states that the [active efforts] showing shall be made by '[a]ny party *seeking to effect* a foster care placement of, or termination of parental rights to, an Indian child.' The 'to effect' language refers to legal proceedings required to accomplish those objectives, not to the act of taking physical custody of a child. Accordingly, the showing required by § 1912(d) need only be made in a hearing on the merits of foster care placement or parental rights termination."

*Id.* at 14-15 (emphasis and second brackets in original; footnote and citation omitted). Although that case dealt with a different factual scenario, our conclusion in this case is consistent with our interpretation of section 1912(d) in *Charles*.

"(2)   At a permanency hearing the court shall:

"(a)   If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts or, if the Indian Child Welfare Act applies, active efforts to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home."

ORS 419B.476(2)(a). Thus, if DHS wants to change a permanency plan for a child to the establishment of a guardianship, it must first satisfy the court at a permanency hearing that active efforts were made and were unsuccessful, which is in keeping with section 1912(d) of ICWA. Once the court has approved the plan of guardianship, it can then grant a party's motion to establish the guardianship in a separate hearing if certain findings are made. ORS 419B.366(5). In a dependency case involving an Indian child, a guardianship established under ORS 419B.366 must comply with ICWA, that is, "[t]he facts supporting any finding made to establish a guardianship * * *, including the finding that continued custody by the parents or Indian custodian would result in serious emotional or physical harm to the Indian child, must be established by clear and convincing evidence," ORS 419B.366(3)—a requirement that mirrors the mandated findings described in section 1912(e) of ICWA.

In this case, DHS satisfied the court that active efforts had been made and were unsuccessful at the 2011 permanency hearing at which the court first approved the plan for guardianship. The 2013 guardianship hearing that is the subject of this appeal was the second step in the two-step process for establishing that guardianship. Therefore, DHS—the party seeking to effect the guardianship—met its burden under section 1912(d) at the permanency hearing and nothing in ICWA or Oregon law required the juvenile court to renew that finding at the guardianship hearing or to place that finding in the judgment.

Because DHS satisfied the court that it had made active efforts to make it possible for child to be returned to mother at the 2011 permanency hearing in which the court changed the permanency plan from return to parent

to establishment of a guardianship, we conclude that the juvenile court did not err when it did not make an "active efforts" finding in the guardianship judgment.

Affirmed.