Argued and submitted August 22, affirmed November 13, 2014, petition for review denied February 19, 2015 (356 Or 767)

In the Matter of S. A. D.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. D.,
*Appellant.*

Jackson County Circuit Court
13JU01640; A156322

340 P3d 86

Shannon Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Mother appeals a jurisdictional and dispositional judgment, challenging the juvenile court's determination that the Department of Human Services (DHS) had made "active efforts," as required by the Indian Child Welfare Act (ICWA) to make it possible for the child to return home to mother and to address mother's mental health issues. Because the record was legally sufficient to support the juvenile court's determination as to DHS's efforts, we affirm.

"[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We "assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record." *Id.*

The underlying facts are undisputed. Prior to child's birth, mother had been diagnosed with anxiety, depressive disorder, paranoia delusional disorder, schizophrenia, schizophrenia form disorder, and "possible paranoid schizophrenia." Mother gave birth to child on October 1, 2013, and, that same day, mother was placed on a psychological hold. The next day, DHS removed child from mother's care and placed child in community foster care. DHS then filed a dependency petition alleging that mother's "chronic mental health problems interfere with her ability to safely parent the child."

Twice in the first five weeks, DHS caseworkers met with mother to discuss child's safety and the conditions for returning child. Because mother indicated that she had been subjected to domestic violence from child's father, DHS caseworker Nye proposed obtaining a neuropsychological evaluation to determine whether mother had a head injury that caused behavior resembling mental illness. Mother agreed to that referral.

In mid-November, Nye referred mother to Dr. Villanueva for a neuropsychological evaluation, but he was unable to

accept the referral. Nye then contacted Dr. Morell, who told her that a neuropsychological evaluation would not help to determine mother's capacity to parent or to be safe for her child, or what services should be provided. Instead, Morell recommended a psychological evaluation first, to determine whether a neuropsychological evaluation would be appropriate. Nye then scheduled a psychological evaluation with Morell on the first available date, which was February 27, 2014 (one month after the jurisdictional and dispositional hearing and nearly five months after child's removal). Nye testified that, if Morell had a cancellation, mother's appointment might happen sooner.

By the time of the hearing, Nye had met with mother on five occasions, but did not think that she was making progress with mother because mother did not seem to understand what Nye was saying. As a result, Nye had decided not to schedule any other services until after the psychological evaluation.

Initially, DHS allowed mother to have one two-hour supervised visit with child each week; DHS later increased the visits to three one-hour visits each week to promote bonding. DHS provided gas vouchers for mother to offset travel expenses. In addition, DHS worked on compiling the necessary documentation to enroll child in the Cherokee tribe, including helping mother to obtain a new Social Security card for child to correct an error on her first card. At the same time, DHS searched for relatives who could be placement resources after attempts to contact child's father were unsuccessful and DHS had determined that grandmother was not a safe or appropriate placement.

At the jurisdictional and dispositional hearing, held on January 30, 2014, mother arrived with her face painted white and testified about voices in her head. She explained that one of those voices was jealous of and threatened to kill child. Mother also testified about five or six other voices in her head who are "very dangerous to my daughter." Mother was unable to lucidly respond when she was asked, "How could they hurt your baby if they're only inside your head?" Mother denied having mental health problems and said that, although she did take medication, she did not take the full

amount because she felt like she was poisoning herself and it made her fall asleep. Grandmother testified that mother was receiving treatment from a doctor through a mental health facility.

At the conclusion of the hearing, the juvenile court concluded that DHS had demonstrated that it had made the required active efforts. *See* ORS 419B.340(1). The court determined that, because mother was still "under the burden of [her] delusions" and was receiving psychiatric treatment but it was not helping, nothing else could be done until the psychological evaluation. The court also pointed to mother's visits with child and the gas vouchers that had been provided to her as evidence of active efforts. Additionally, the court referenced testimony from Richard England, a licensed social worker with over 20 years of experience in Indian programs and himself an enrolled member of the Yurok tribe. England had opined that DHS's efforts were sufficient "based on the severity of the issues that we heard today" and the "concerning nature" of mother's testimony about "threats to self or others."

Mother objects to the juvenile court's determination that DHS had made active efforts. She argues that scheduling the psychological evaluation almost five months after child's removal does not constitute active efforts. She contends that DHS failed to provide any services to assist in ameliorating her mental health issues—the basis for DHS's intervention—and that DHS should have scheduled an appointment with a psychologist who could have seen mother sooner, assisted mother in accessing psychiatric medical management services, and consulted with mother's mental health provider. Mother further argues that "providing mother with mental health services was required to eliminate the need for [child's] removal and effect her quick and safe reunification with mother, just as ICWA contemplates."

ORS 419B.340(1) provides that, "[i]f the court awards custody to [DHS], the court shall include in the disposition order a determination whether [DHS] has made reasonable efforts, or if the [ICWA] applies, active efforts * * * to make it possible for the ward to safely return home[.]" The

court considers "the ward's health and safety the paramount concerns" in making its determination, *id.*, and is required to "enter a brief description of what preventive and reunification efforts were made and why further efforts could or could not have prevented or shortened the separation of the family" to support its active efforts determination. ORS 419B.340(2). When an Indian child is involved, DHS must show that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful." ORS 419B.340(7).

"Active efforts" is a higher standard than reasonable efforts; the standard obligates DHS to do more than "creat[e] a reunification plan and requir[e] the client to execute it independently." *State ex rel Juv. Dept. v. T. N.*, 226 Or App 121, 124, 203 P3d 262, *rev den*, 346 Or 257 (2009). Rather, the agency must "assist the client through the steps of a reunification." *Id.* "The type and sufficiency of effort that DHS is required to make depends on the particular circumstances of the case." *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 799, 284 P3d 1233 (2012). In determining whether efforts were active, a court considers "whether a parent is likely to benefit from a service" in light of the nature of the parent's problems. *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013).

In this case, DHS did more than "create a reunification plan and require the client to execute it independently." DHS consulted psychologists and scheduled appointments, planned visits, issued gas vouchers, actively searched for relative placements, and worked with the Cherokee tribe to enroll child. Although mother insists that DHS should have called other psychologists to schedule an earlier psychological evaluation, we do not find that five-month period inherently unreasonable under these circumstances, particularly given that the record supports the inference that an earlier assessment would not have ameliorated mother's condition to a degree sufficient to enable child's return. Because we consider DHS's efforts in light of the unique circumstances of a particular case, including whether mother is able to benefit from services and mother's particular problems, we

conclude that the evidence in the record was legally sufficient to support the court's determination that DHS made the required active efforts.[1]

 Affirmed.

---

[1] The juvenile court emphasized the testimony of England. Our conclusion is based on all the evidence in the record and does not depend on that testimony, which merely stated an opinion as to the ultimate issue the juvenile court was called upon to decide.